UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
                                                                          :
UNITED STATES OF AMERICA
                                                                          :
          - v. -
                                                                          :
BRANDON BECKER and                              S2 19 Cr. 704 (LAP)
STEVEN BREIER,                                                            :

                              Defendants.                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X


GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT BRANDON BECKER'S OMNIBUS DISCOVERY MOTION


AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York,
Attorney for the United States
            of America


DAVID RAYMOND LEWIS
VLADISLAV VAINBERG
*Assistant United States Attorneys*
  - Of Counsel –

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................ii

TABLE OF AUTHORITIES .........................................................................................iv

PRELIMINARY STATEMENT ......................................................................................1

BACKGROUND ............................................................................................................2

    A.  The Charges ...................................................................................................2

    B.  Relevant Persons and Entities .......................................................................4

    C.  The Payment-Card Processing Industry.........................................................5

    D.  The Charged Fraud Scheme...........................................................................6

ARGUMENT .................................................................................................................9

I.  The Government Is Complying With Its Discovery Obligations Under Rule 16........9

    A.  The Government has Provided Rule 16 Discovery.........................................9

    B.  Specific Defense Objections to the Government's Discovery.......................11

II.  The Defendant's "Case Specific Discovery Requests" Should Be Denied ..............12

    A.  The Federal Rules of Criminal Procedure Do Not Sanction Defendant's Civil-Style Interrogatories...................................................................................13

    B.  The Defendant's Hundreds of Requests Akin to a Motion for a Bill of Particulars Should Be Denied .......................................................................14

        1.  Applicable Law ...........................................................................15

        2.  Discussion....................................................................................19

    C.  Defendant's Requests that the Government Create Indices, Summaries, and

Financial Schedules Are Baseless ............................................................... 23

III. Witness Information ........................................................................................ 24

    A. Jenks Act and *Giglio* Material ..................................................... 25

    B. *Brady* Material ............................................................................. 26

    C. Witness List ................................................................................. 27

    D. Identity and Whereabouts of Witnesses and Informants and Disclosure of Co-Conspirator Statements ............................................................... 28

IV. Defendant's Request for Immediate Rule 404(b) Notice Should Be Denied As Premature ...................................................................................................... 30

V. United States Sentencing Guideline Analysis ............................................... 31

CONCLUSION ..................................................................................................... 32

# TABLE OF AUTHORITIES

**Cases**

*United States v. Abakporo,* 959 F. Supp. 2d 382 (S.D.N.Y. 2013) ................................................ 16

*United States* v. *Alessi*, 638 F.2d 466 (2d Cir. 1980)..................................................................... 27

*United States v. Allums*, No. 97 CR. 267 (HB), 1997 WL 599562 (S.D.N.Y. Sept. 25, 1997).... 31

*United States v. Amaya-Manzanares*, 377 F.3d 39 (1st Cir. 2004) ............................................... 24

*United States v. Annabi*, No. S1 10 Cr. 7 (CM), 2011 WL 6015635 (S.D.N.Y. Nov. 30, 2011) . 28

*United States v. Bedolla*, No. 04–40001–01 (SAC), 2004 WL 2030288,

    (D. Kan. Aug, 19, 2004) ......................................................................................................... 14

*United States v. Bejasa,* 904 F.2d 137 (2d Cir. 1990) .................................................................... 27

*United States v. Bielli*, 697 F. Supp. 2d 403 (E.D.N.Y. 2010) ...................................................... 28

*United States v. Bonventre*, 10 Cr. 228 (LTS), 2013 WL 2303726 (S.D.N.Y. 2013) .................. 16

*United States v. Buckner,* 417 F. Supp. 2d 240 (S.D.N.Y. 2005) .................................................. 31

*United States v. Cannone*, 528 F.2d 296 (2d Cir. 1975).................................................................. 27

*United States v. Cephas*, 937 F.2d 816 (2d Cir. 1991) ............................................................. 17, 21

*United States v. Chavez*, 15 Cr. 54-5 (RGJ), 2018 WL 6251387 (W.D. Ky. Nov. 29, 2018) ...... 24

*United States v. Cimino*, 31 F.R.D. 277 (S.D.N.Y. 1962) ............................................................. 18

*United States v. Conder*, 423 F.2d 904 (6th Cir. 1970) ................................................................. 14

*United States v. Craig*, No. 87 CR 436-1, 1987 WL 17137 (N.D. Ill. Sept. 3, 1987) .................. 14

*United States v. Davis*, No. 05 CR. 0694 (VM), 2006 WL 20493 (S.D.N.Y. Jan. 3, 2006)......... 31

*United States v. Feola*, 651 F. Supp. 1068 (S.D.N.Y. 1987)......................................................... 17

iv

*United States v. Giffen*, 379 F. Supp. 2d 337 (S.D.N.Y. 2004) ...................................... 27

*United States v. Goode,* 16 Cr. 529 (NSR), 2018 WL 919928 (S.D.N.Y. Feb. 15, 2018) .......... 30

*United States v. Gottlieb*, 493 F.2d 987 (2d Cir. 1974) ............................................... 16

*United States v. Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) ................................. 17, 18

*United States v. Hunter*, 13 F.Supp.2d 586 (D.Vt. 1998) .......................................... 14

*United States v. James,* 2007 WL 914242 (E.D.N.Y. Mar. 21, 2007)........................................ 27

*United States v. Joseph,* 02 CR 1589 (LTS), 2003 WL 22019427 (S.D.N.Y. Aug. 26, 2003) .... 29

*United States v. Kahl*, 583 F.2d 1351 (5th Cir. 1978) ................................................. 24

*United States v. Kasnetz,* 2020 WL 5038529 (N.D Tex. Aug. 26, 2020).................................... 24

*United States v. Kogan*, 283 F. Supp. 3d 127 (S.D.N.Y. 2017)...................................... 18

*United States v. LaMorte*, 744 F. Supp. 573 (S.D.N.Y. 1990) ................................. 16, 17

*United States v. Leonelli*, 428 F. Supp. 880 (S.D.N.Y. 1977) ...................................... 18

*United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657

   (S.D.N.Y. Aug. 26, 2014) ................................................................... 16, 17

*United States v. Mahon*, No. 09 Cr. 712 (PHX) (DGC), 2011 WL 5006737

   (D. Ariz. Oct. 20, 2011) ................................................................................ 24

*United States v. McCarroll*, No. 95 CR 48, 1996 WL 99442 (N.D. Ill. Mar. 5, 1996) ............... 24

*United States v. Minaya,* 395 F. Supp. 2d 28 (S.D.N.Y. 2005) ..................................... 30

*United States v. Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001).............................. 18, 21

*United States v. Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957 (S.D.N.Y. Aug. 4, 2011)

   ................................................................................................. 15, 23

*United States v. Muyet*, 945 F. Supp. 586 (S.D.N.Y. 1996) ........................................................ 17

*United States v. Padilla*, No. S1 94 CR. 313 (CSH), 1994 WL 681812

(S.D.N.Y. Dec. 5, 1994) ................................................................................................ 25, 26

*United States v. Parris*, No. 13 Cr. 17 (DAB), 2014 WL 2745332 (S.D.N.Y. June 17, 2014) .... 21

*United States v. Percevault*, 490 F.2d 126 (2d Cir.1974) ..................................................... 25, 28

*United States v. Percoco*, No. 16-cr-776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017)  29

*United States v. Pimentel,* 932 F.2d 1029 (2d Cir. 1991) ......................................................... 2, 32

United States v. Reddy, 190 F. Supp. 2d 558 (S.D.N.Y. 2002) .................................................... 29

*United States v. Rigas*, 258 F. Supp. 2d 299 (S.D.N.Y. 2003) .................................................... 16

*United States v. Roberts*, 388 F.2d 646   (2d Cir. 1968) ............................................................. 28

*United States v. Saade,* No. S1 11 Cr. 111, 2012 WL 2878087 (S.D.N.Y. July 11, 2012) .......... 31

*United States v. Salazar*, 485 F.2d 1272 (2d Cir. 1973) ............................................................. 16

*United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721

(S.D.N.Y. Jan. 23, 2009) ................................................................................................ 16, 17

*United States v. Schulter*, 19 F.R.D. 415 (S.D.N.Y. 1956) .......................................................... 14

*United States v. Shaw,* No. 16 Cr. 642 (RJS), 2017 WL 11501885 (S.D.N.Y. Feb. 13, 2017) .... 12

*United States v. Sindone*, No. 01 Cr. 517 (MBM), 2002 WL 48604 (S.D.N.Y. Jan. 14, 2002).. 15, 18

*United States v. Strawberry*, 892 F. Supp. 519 (S.D.N.Y. 1995) ..................................... 16, 17, 21

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990) .......................................................... 15, 21

*United States v. Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 WL 562649

(S.D.N.Y. Apr. 15, 2002) ............................................................................... 16

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) ................................................ 17, 30

*United States v. Upton*, 856 F. Supp. 727 (E.D.N.Y. 1994) ....................................... 12

*United States* v. *Washington*, 947 F. Supp. 87 (S.D.N.Y. 1996) .................................... 27

*Weatherford v. Busey*, 429 U.S. 545 (1977) ............................................................. 27

**Federal Rules**

Fed. R. Crim. P. 16 ....................................................................................... 12, 28

Fed. R. Crim. P. 7(f) ..................................................................................... 15

Fed. R. Evid. 404(b) ...................................................................................... 30

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the discovery motion of defendant Brandon Becker.[1]  In a sprawling 78-page motion that intersperses factual responses to the charges, rote and often inapposite case law, and hundreds of specific production requests, Becker appears to move for the following categories of relief: (1) production of Rule 16 discovery (which has already been provided); (2) responses to 203 "case specific discovery requests," some akin to a bill of particulars but more often akin to civil interrogatories; (3) production of a list of all persons with knowledge of any relevant facts and any witness statements in the Government's possession; (4) production of a list of all co-conspirators and a description of the role of each; (5) *Brady* information; (6) early disclosure of a witness list, 3500 material, and *Giglio* material; (7) immediate notice of evidence to be introduced under Federal Rule of Evidence 404(b); (8) information bearing on calculations under the Sentencing Guidelines; and (9) requests for reproduction of certain discovery files and assistance with technical questions pertaining to prior discovery productions.   As part of his 203 case specific requests, Becker asks that the Government be directed to create various indices, summaries, and financial schedules, including indices tying specific documents to dozens of specific issues and individuals, and various financial schedules detailing losses to particular victims and the flow of fees to various persons and entities.

For the reasons discussed below, nearly all of the defendant's discovery requests lack factual and legal basis, seek materials already provided to the defendant as part of Rule 16

---

[1]  The defendant's discovery motion (ECF No. 33) is cited as "Mem." and the enumerated Requests in that motion are referenced by Request number.

discovery, or are premature.   Insofar as the defendant asks the Government to produce a new copy of previously-produced files or confer regarding technical issues relating to the production, the Government has and will continue to do so.   The Government also has no objection to beginning to produce interview notes and statements from individuals whom the Government does not presently expect to call as witnesses at trial.   Nor does the Government object to providing a *Pimentel* letter, should one be requested by the defendant, setting forth the Government's view of relevant calculations under the United States Sentencing Guidelines.

In all other respects, for the reasons set forth below, defendant's motion should be denied.

## BACKGROUND

### A.  The Charges

The second superseding indictment (the "Indictment" or "Ind.")), charges Becker and co-defendant Steven Breier in four courts with:   (1) conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349; (2) conspiracy to make false statements to a bank, in violation of 18 U.S.C. § 371; (3) wire fraud, in violation of 18 U.S.C. § 1343; and (4) bank fraud, in violation of 18 U.S.C. § 1344.

As charged in the Indictment, the Government intends to prove at trial that, from approximately 2012 through 2015, Becker, Breier, and others used CardReady to operate a scheme to fraudulently obtain millions of dollars of payment-card processing services for CardReady clients—and in particular for a client known as "E.M. Systems" or "EMS."[2] The defendants devised a scheme to obtain processing for clients who could not open and maintain a

---

[2]  E.M. Systems and Services, LLC and affiliated companies are identified in the Indictment as "Telemarketer-1."

merchant accounts in their own name, such as telemarketers selling services prohibited by the applicable rules, or clients using deceptive selling practices that would result in high chargebacks and eventual cancellation of the merchant account.   The defendants created multiple sham merchant accounts to be used for those clients by submitting falsified merchant applications in the names of various sham companies, headed on paper by recruited "signers," ordinary people who had no actual business of their own.   (Ind. ¶ 1).

This scheme enabled Becker and CardReady to open sham merchant accounts in the names of non-existent businesses, to conceal the true merchant and the business of that merchant, and, as time went on, to conceal excessive numbers of customer "chargebacks" paid back to unsatisfied consumers across dozens of seemingly independent merchant accounts that were secretly processing transactions for a single underlying, undisclosed entity. (Ind. ¶¶ 1-2).

Through these sham merchant accounts, Becker and others enabled some of their merchant-clients—particularly including EMS—to conceal their identities, gain and maintain access to the payment-card processing system, spread out charges and chargebacks across multiple sham merchant accounts, and obtain money from a bank and its associated payment processor, First Data.   (Ind. ¶ 1).

Through the fraudulent use of these sham merchant accounts, Becker and CardReady enabled EMS to obtain payment-card processing services for its own telemarketing scheme, through which it sold "interest rate reduction" and "debt reduction" programs, to thousands of customers carrying substantial credit card debt.   All told, CardReady, Becker, and his co-conspirators enabled EMS to process over $19 million in payment-card payments from EMS's customers across 26 sham merchant accounts.   Over $6 million of that amount was ultimately repaid to consumers in refunds and chargebacks based on customers' allegations of fraud,

3

deceptive tactics, and failure to receive the purchased services.[3]   (Ind. ¶ 3).

### B.  Relevant Persons and Entities

As described in the Indictment, and as the Government intends to prove at trial, Becker was the CEO and *de facto* head of CardReady, a company that he controlled.   Co-defendant Breier was an independent sales agent, who, in return for commissions based on sales volume, introduced CardReady to high-risk merchants that were seeking to obtain payment-card processing purposes. (Ind. ¶¶ 4-5).

EMS was a set of affiliated companies that used telemarketers to cold-call consumers and sell them various purported financial services at costs ranging from approximately $695 to at least $1,495 per transaction.   EMS was a client of CardReady, for whom Becker, Breier, and CardReady obtained card processing services through First Data and Wells Fargo.   (Ind. ¶ 6).

CardReady functioned as what is known in the payment-card industry as a sales agent or sub-Independent Sales Organization ("sub-ISO").   As a sales agent, CardReady offered card processing services to businesses that wanted to be able to accept credit or debit cards in their businesses.   In order to obtain such services for its merchant customers, CardReady helped to prepare and submit "merchant applications" to a Manhattan-based ISO called First Pay.[4]   (Ind. ¶ 7).

---

[3] Unlike a refund, which is voluntarily processed by the merchant, a chargeback is a reversal of a transaction initiated by the customer through his or her credit card company due to unauthorized use, fraud, or failure to receive the product or serviced purchased, among other things.

[4] First Pay Solutions, or "First Pay," is referred to in the Indictment as the "New York ISO;" First Data Merchant Services, LLC, or "First Data," is referred to in the Indictment as "Payment Processor-1;" and Wells Fargo bank is referred to in the Indictment as "Bank-1."

As an ISO, First Pay had contractual relationships with a payment processor called First Data and with Wells Fargo bank, which in turn had contractual relationships with the "Credit Card Networks" (such as Visa, Mastercard, American Express, and Discover).   (Ind. ¶ 7).

Among other things, First Pay reviewed and evaluated new merchant applications submitted by CardReady to determine whether to accept the merchant for processing with First Data and Wells Fargo, pursuant to contractual standards and guidelines.   First Data, in turn, provided payment technology and card processing services for Wells Fargo.   (Ind. ¶¶ 8-9).

### C.  The Payment-Card Processing Industry

In order to accept payment cards (*i.e.,* credit and debit cards) from customers purchasing goods and services, a business is required to complete a merchant application and establish a merchant account with a sponsoring bank, such as Wells Fargo, that is a member of the "Credit Card Networks."   Various entities act as intermediaries between merchants and sponsoring banks. These entities can include sales agent companies like CardReady, which find merchants, agree to obtain processing services for the merchants, and submit merchant applications to an ISO (here, First Pay), a payment processor (here, First Data), and/or a sponsoring bank (here, Wells Fargo). (Ind. ¶ 11).

In this case, as is typical in the industry, these relationships were regulated by contracts among CardReady, First Pay, First Data, and Wells Fargo, which incorporated contractually agreed-upon guidelines, policies, rules, and standards from the Credit Card Networks, Wells Fargo, and First Data (collectively, the "Guidelines").   (Ind. ¶ 12).

The Guidelines prohibited CardReady from submitting to First Pay applications for payment processing services for certain "unqualified" businesses, including those marketing debt consolidation, credit repair, and interest rate reduction services.   The Guidelines also prohibited

the First Pay or First Data from accepting merchants engaging in deceptive tactics to avoid chargeback monitoring programs, such as by splitting their transactions among sham merchant accounts opened in other entities' names, among other things.   (Ind. ¶ 13).

### D.  The Charged Fraud Scheme

As charged in the Indictment, and as the Government intends to prove at trial, defendant Brandon Becker and Steven Breier negotiated a deal in 2012 with Steven Short, the principal of EMS.   Under this extraordinary agreement, alternately referred to in correspondence to and from Becker as the "32 Percent Deal" or the "34 Percent Deal," CardReady would retain approximately one-third of EMS's payment-card sales proceeds in exchange for providing EMS with access to the payment-card processing network.   Under a side agreement between Becker and Breier, Breier would receive approximately one-half of CardReady's share.   (Ind. ¶ 14).

At all relevant times, EMS was engaged in a marketing scheme in which it cold-called customers and offered services, including debt consolidation and interest-rate reduction, which were prohibited by the Guidelines.   In addition, as Becker knew, EMS's business was destined to produce chargebacks from dissatisfied customers far in excess of the number and rate of chargebacks permitted under the Guidelines. (Ind. ¶ 15.)

To secure these payment-card processing for EMS, Becker and his co-conspirators created a scheme to conceal that EMS was the true merchant processing its transactions through Wells Fargo, First Data, and First Pay.   Over a period of more than twenty months, Becker and his co-conspirators created approximately 26 sham merchant companies, each headed by a "signer" (the "Sham Merchants" and the associated merchant accounts, the "Sham Merchant Accounts").   The 26 "signers" for the 26 Sham Merchants typically had no business of their own, and lacked knowledge of EMS's business.   (Ind. ¶¶ 16-17.)

6

Becker and his co-conspirators prepared and coordinated fraudulent merchant applications for each of the Sham Merchants.   Those merchant applications falsely described the purported business, physical site, and employees of each of the Sham Merchants to make them look like legitimate independent businesses, and make it more likely that the First Pay, First Data, and Wells Fargo would approve the associated Sham Merchant Account.   Each Sham Merchant application also concealed that the Sham Merchant was effectively an alter-ego of EMS, and its affiliation with other the other Sham Merchant Accounts used for EMS's transactions, including those previously terminated by First Pay and First Data for excessive chargebacks.   (Ind. ¶¶ 18-19).

Becker and others, particularly including his subordinates at CardReady, caused CardReady to submit the false merchant applications for the Sham Merchants to First Pay.   Based in part upon these false representations from Becker and CardReady, First Pay approved the Sham Merchant Accounts and opened accounts for payment processing with First Data and Wells Fargo. (Ind. ¶ 20).

At or about the same time, Becker and CardReady caused bank accounts to be opened for each of the Sham Merchants, in order to receive transaction payments from Wells Fargo.   The bank accounts were controlled by Becker and CardReady, and not by the signers on whose behalf the accounts were purportedly opened. (Ind. ¶ 21).   Between 2012 and 2014, Wells Fargo processed over $19 million in sales from EMS customers, as well as approximately $6 million in chargebacks, through the bank accounts that CardReady controlled on behalf of the 26 Sham Merchant Accounts.   (Ind. ¶¶ 21-22).

By steering EMS's payment processing through these Sham Merchant Accounts, Becker and his co-conspirators accomplished a number of fraudulent purposes.   First, the use of these Sham Merchant Accounts made it possible for EMS to conceal its identity from First Data and

Wells Fargo and to maintain payment-card processing.  This was particularly relevant as First Data repeatedly required CardReady to close individual Sham Merchant Accounts because of excessive chargebacks and reports of sales of prohibited services such as debt consolidation and interest rate reduction services.   Becker and his co-conspirators then caused CardReady to quickly replace the closed Sham Merchant Accounts with new Sham Merchant Accounts, precluding First Data from shutting down its processing of EMS.   (Ind. ¶ 23a).

Second, the fraudulent processing scheme enabled EMS to spread out its charges, refunds, and chargebacks across multiple Sham Merchant Accounts.  This enabled EMS to evade chargeback monitoring programs operated by Wells Fargo, First Data, and First Pay.  For example, under the Guidelines, merchant accounts that accrued over 100 chargebacks per month and a ratio of more than 1% of chargebacks to transactions, were likely to be flagged and terminated.   The Sham Merchant Accounts associated with EMS averaged over 10% chargebacks every month after July 2013, and ranged as high as approximately 61% chargebacks in August 2014, two months before First Data terminated the last of the Sham Merchant Accounts. Collectively, these Sham Merchant Accounts exceeded 100 chargebacks per month from July 2013 through October 2014.   However, because EMS's transactions were split across the Sham Merchant Accounts, none of the Sham Merchant Accounts individually exceeded 100 chargebacks a month, making it less likely each Sham Merchant Accounts would be expeditiously flagged and terminated. (Ind. ¶¶ 23b-c.).

## ARGUMENT

### I.  The Government Is Complying With Its Discovery Obligations Under Rule 16

Defendant's first argument in the instant motion is that he is entitled to discovery in compliance with Rule 16 of the Federal Rules of Criminal Procedure. (Mem. 15-21).[5]   That assertion is beyond dispute.   But in light of the Government's conscientious compliance with those obligations in this case, defendant's assertion provides no basis for relief.

#### A.  The Government has Provided Rule 16 Discovery

Throughout this case, the Government has carefully and thoroughly complied with its obligations under Federal Rule of Criminal Procedure 16, and will continue to so comply.   The Government has provided all Rule 16 material of which it is aware in its possession, and, where such discovery was particularly voluminous, has provided it in a form that is loadable and searchable in a database.   And when defense counsel has encountered problems reading some of the computerized files so produces, the Government has readily provided replacement copies.

Moreover, the Government has accompanied each of its discovery productions with a detailed cover letter (Exh. 1-5)[6] and an index explaining specifically the materials being produced (Exh. 6).   All materials have been provided electronically.

The Government provided its first, and main, discovery production on December 30, 2019. As reflected in the cover letter accompanying that production, it included documents from a variety of sources, each specifically identified in the cover letter and the accompanying index. (Exh. 1, 6.)

---

[5] Defendant Becker's "Motion for Discovery; Memorandum of Points and Authorities in Support Thereof," Sept. 2, 2020.

[6] *See generally*, the accompanying Affirmation of David Raymond Lewis.

The Government's cover letter and its index, as well as its Bates numbering system, also specifically identified which documents were being provided in database-loadable and searchable form.  (*See* Exh. 1 at items 8-9; Exh. 6 at lines 10-11).

As explained by the Government at the time, this first discovery production included not only the discovery files compiled by the Government in conducting the instant investigation, but also files from the Federal Trade Commission ("FTC"), which had conducted a civil investigation that resulted in civil charges against Becker and CardReady, among others, for civil violations involving some of the same conduct charged in the instant case.[7]   In a scrupulous effort to insure fulsome compliance with Rule 16, the Government also contacted the FBI in Florida, to obtain files of an earlier investigation that included some files of the Florida Office of the Attorney General ("FOAG").[8]

In March 2020, the defense informed the Government that defense counsel was unable to open some of the Government's electronic discovery files and requested additional metadata to

---

[7] By way of background, in 2015, the FTC and FOAG filed civil charges against, among others, CardReady, EMS, Becker, and CardReady employees James Berland and Andrew Padnick. Becker and his civil co-defendants were charged in that case with participating in, *inter alia,* unfair trade practices and consumer fraud.  *See* First Amended Complaint, *FTC .v. EMS, CardReady, Becker, et al.,* 8:15-cv-1417-T-23EAJ (M.D. Fla.; Dec. 21, 2015).  CardReady, Becker, and Berland agreed to settle those civil charges in July 2016, without admitting or denying the allegations.  The settling civil defendants, including Becker, agreed to injunctive relief and to a monetary judgment of $12,365,731 (or a reduced amount if the judgment was paid quickly).  The Government is not aware of Becker or CardReady ever making any payments toward this monetary judgment.  More recently, on May 19, 2020, the FTC filed and settled a civil action against First Data and the former principal of First Pay.  *See FTC v. First Pay, et ano.,* No. 20-cv-3867 (S.D.N.Y.).

[8] Defense counsel requests a reproduction of the documents comprising Rule 16 discovery that were obtained from the FBI in Florida.  The Government has no objection, and will contact defense counsel to arrange for production of a duplicate set.

facilitate loading the documents on a database.   Accordingly, on April 1, 2020, the Government produced a replacement database export file (in .dat format) which contained the additional fields requested by the defense. (*See* Exh. 6 at line 23).

The Government made a second discovery production, of newly acquired documents, on April 13, 2020.   Subsequently, defense counsel advised of technical issues in opening the production, and the Government produced a duplicate set on May 7, 2020.   (*See* Exh. 2; Exh. 6 at lines 24-34). The Government has since provided two additional, small discovery productions of documents acquired more recently.   (*See* Exhs. 3-4; Exh. 6 at lines 35-40).

### B.  Specific Defense Objections to the Government's Discovery

Defendant's boilerplate requests for various categories of Rule 16 discovery ignore the responsive discovery the Government has actually provided in this case.   For example, defendant makes the point that the Government is required to provide records reflecting defendant's post-arrest statements (Mem. 16-19), without noting that the Government did so in its first production (*See* Exh. 1, item 10; Exh. 6, line 16).   Defendant further notes the obligation to produce reports of examinations and tests, as well as any expert reports (Mem. 21).   The Government has produced none of these because it does not possess any.

Defendant also complains at several points in his motion papers about "deeply nested folders, missing files, and data corruption." (Mem. 6, *see also id.* at 6-10, 68, Request No. 200). In the main, as described in defendant's memorandum, this problem seems to be centered on two collections of documents.   The first are documents on drives that CardReady itself provided in this case, in response to a grand jury subpoena served upon its custodian of records. (*See* Exh. 1 at item 9 (describing source of the CardReady documents); Exh. 6 at line 10).   The Government has provided defendant with a bates-stamped loadable database export of those files, and indeed has

11

produced them twice at defense request.  (*See* Exh. 6 at lines 22-23).  This format allows the defense to load the files in Relativity – as they have done – and conduct keyword and other searches.  To the extent the defense wishes to obtain the original files in non-processed form as they were given to the Government, the Government has no objection to making such a production.

At bottom, the discovery requirements of Rule 16 are limited by their very terms to documents and things in the "government's possession, custody, or control" that are "material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E)(i).  Thus, "the Government cannot be required to produce files that it does not possess."  *United States v. Shaw,* No. 16 Cr. 642 (RJS), 2017 WL 11501885 at *3 (S.D.N.Y. Feb. 13, 2017); *United States v. Upton*, 856 F. Supp. 727, 749 (E.D.N.Y. 1994).  The Government can hardly be faulted if some of the files that CardReady produced contained data errors.  Likewise, while the Government acknowledges the challenges of analyzing large volumes of discovery, it bears repeating that the organizational structure of the CardReady folders was created by the defendant's company and provided in that form to the Government.  The defendant is clearly at least as well positioned as the Government to search through his own company's data.

Defendant also complains about problems in some of the files that the Government obtained from the FTC and the Florida office of the FBI, both of which conducted earlier investigations.  (Mem. 9).  Here, the Government has produced these files in the same form that we possess them, and again at defense request have produced them twice.  (*See* Exh. 1 at items 5-6; Exh. 6 at lines 8-9).  Although the Government stands ready to discuss technical issues, it "cannot be required to produce files that it does not possess."  *Shaw,* 2017 WL 11501885, at *3.

## II.   The Defendant's "Case Specific Discovery Requests" Should Be Denied

In Section III of the defendant's blunderbuss discovery motion, defendant lodges some 203 "case specific discovery requests."   Aside from requests for documents already produced, or for a reproduction of the same, these requests are meritless and should be denied.

A. **The Federal Rules of Criminal Procedure Do Not Sanction Defendant's Civil-Style Interrogatories**

As an initial matter, many of these "requests" are framed as scattershot interrogatory questions about, *inter alia*, the operation of the defendant's own company and its contractual counterparties,[9] the responsibilities and actions of the defendant's employees and other witnesses,[10] the status of other individuals or entities in the Government's investigation,[11] and the Government's theory of the case and the manner in which it may prove its allegations.[12]   By the Government's count, the defendant's 78-page motion seeks the answers to at least 38 separate questions, aside from any document requests.[13]   The defendant fails to support any of these impermissible interrogatories with any legal authority.   And for good reason: it is well established

---

[9] *See e.g.*, Request 117 ("Who was responsible for targeting and setting up merchant accounts? Please provide documents in the government's possession showing the respective roles of First Data, First Pay, Wells Fargo and CardReady. )

[10] *See, e.g.*, Request 135 ("What actions, if any, did Berland take upon learning of consumer complaints and excessive chargebacks?"); Request 25 ("What was Steven Breier's role in setting up the merchant accounts?")

[11] *See, e.g.*, Request 67 ("Have EM Systems or Steven Short been charged with criminal activity?")

[12] *See, e.g.*, Request 48 ("Does the government allege Brandon Becker or CardReady was aware that EM Systems was allegedly using merchant accounts to commit credit card laundering whereby credit card transactions with EM Systems appeared to come from separately owned merchant accounts?")

[13] *See* Requests 4, 5, 6, 7, 13, 14, 15, 20, 24, 25, 47, 48, 52, 53, 60, 67, 70, 71, 72, 75, 81, 83, 117, 135, 136, 147, 181, 183, 184, 195.

that the Federal Rules of Criminal Procedure do not require the Government to respond to civil-style defense interrogatories in a criminal case.   *See United States v. Conder*, 423 F.2d 904, 910 (6th Cir. 1970) ("[T]he interrogatories filed by the defendant here were not an appropriate mode of discovery under Rule 16(b)."); *United States v. Hunter*, 13 F.Supp.2d 586, 590 (D.Vt. 1998) ("[defendant] is intending to use the motion for a bill of particulars for discovery purposes. The requests resemble civil interrogatories. . . . To require the government to disclose information beyond the scope of Rule 16(a) would violate the purpose of the discovery rules and the purpose of a bill of particulars."); *United States v. Bedolla*, No. 04–40001–01–(SAC), 2004 WL 2030288, at *2-3 (D. Kan. Aug, 19, 2004) ("Defendant's motion is styled more like a civil interrogatory than a bill of particulars. A bill of particulars is not intended to serve as a discovery device or to compel the government's disclosure of the factual proof planned at trial."); *United States v. Craig*, No. 87 CR 436-1, 1987 WL 17137, at *2 (N.D. Ill. Sept. 3, 1987) ("The government, in its response, correctly notes that the Federal Rules of Criminal Procedure do not provide for interrogatories and that the government is under no obligation to answer the interrogatories posed by [defendant's] motion."); *accord United States v. Schulter*, 19 F.R.D. 415, 416 (S.D.N.Y. 1956).

## B.  The Defendant's Hundreds of Requests Akin to a Motion for a Bill of Particulars Should Be Denied

Aside from the interrogatories, the defendant interposes literally hundreds of document requests that comprise the "when, where, and how" of virtually every act related to his criminal conduct.  As discussed above, to the extent the evidence sought by the defendant is subject to production under Rule 16, the Government has complied with its Rule 16 obligations.  To the extent the defendant's panoply of requests may be liberally construed as a motion for a bill of

14

particulars (notwithstanding the defendant's failure to seek such relief explicitly), they should be summarily denied.

### 1. Applicable Law

Rule 7(f) of the Federal Rules of Criminal Procedure permits a defendant to move for a bill of particulars "before or within 14 days after arraignment or at a later time if the court permits." Fed. R. Crim. P. 7(f).   The proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charges to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense.   *See United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990).   "[A] bill of particulars was not created to help the defendant investigate the charges in the indictment.   Rather, it is designed to avoid unfair surprise to the defendant at trial, and to permit" a defendant to invoke a double jeopardy defense.   *United States v. Sindone*, No. 01 Cr. 517 (MBM), 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14, 2002). "Those are the only legitimate purposes of a bill of particulars."   *Id.*   "Acquisition of evidentiary detail is not the function of the bill of particulars[,]" and a bill of particulars "should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."   *Torres*, 901 F.2d at 234 (citations and internal quotation marks omitted).

In exercising its broad discretion to determine whether the charges are "so general" that they require supplementing, the Court should consider not just the text of the charging instrument, but also discovery and other information supplied to the defendant to date.   *See, e.g.*, *United States v. Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957, at *4 (S.D.N.Y. Aug. 4, 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *United States v.*

15

*Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *4 (S.D.N.Y. Jan. 23, 2009) (denying request for bill of particulars where indictment, discovery letters, and discovery materials, including search warrant affidavits, gave defendant adequate information to prepare for trial); *United States v. Bonventre*, 10 Cr. 228 (LTS), 2013 WL 2303726, at *7 (S.D.N.Y. 2013) ("The Government's opposition brief sufficiently alerts [defendant] as to its theories concerning the crimes with which he is charged.").

A defendant cannot use a bill of particulars as a general investigative tool, *see United States v. Salazar*, 485 F.2d 1272, 1277-78 (2d Cir. 1973); *United States v. Strawberry*, 892 F. Supp. 519, 526 (S.D.N.Y. 1995) (Parker, *J.*), or as a device to compel disclosure of the Government's evidence prior to trial, *see United States v. Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (citing *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974)); *United States v. Abakporo,* 959 F. Supp. 2d 382, 388-89 (S.D.N.Y. 2013) ("[a] bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered at trial." (citations omitted)).   "The Government is not required to disclose the manner in which it will attempt to prove the charges, nor the means by which the crimes charged were committed."   *Triana-Mateus,* 2002 WL 562649, at *5; *United States v. LaMorte*, 744 F. Supp. 573, 577 (S.D.N.Y. 1990) ("It is improper to use a bill of particulars to compel the Government to disclose the manner in which it will prove the charges or preview its evidence or legal theory.").

Nor should a bill of particulars be weaponized to "lock the government into its proof." *United States v. Rigas*, 258 F. Supp. 2d 299, 304 (S.D.N.Y. 2003); *see also United States v. Mahabub*, No. 13 Cr. 908 (AJN), 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014) ("The government's presentation of evidence at trial is limited to the particulars contained in the bill, so

16

care must be taken not to overly restrict the government's proof while still protecting the defendant from unfair surprise."); *Samsonov*, 2009 WL 176721, at *3 (cautioning that a bill of particulars "must not . . . be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches").

Thus, the ultimate test is whether the information sought is necessary, not whether it is helpful. *See United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); *Strawberry*, 892 F. Supp. at 526 ("That the requested information would be useful to the defendant is not enough; if the defendant has been given adequate notice of the charges against him, the Government need not be required to disclose additional details about its case."); *LaMorte*, 744 F. Supp. at 577 ("The important question is whether the information sought is necessary, not whether it is helpful."). Under the relevant legal standard, the Government is not required to "particularize all of its evidence[,]" *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991), or provide the defendant with a preview of the Government's case or legal theory, *see United States v. Muyet*, 945 F. Supp. 586, 598-99 (S.D.N.Y. 1996).

There are good reasons why bills of particulars are warranted only where the allegations in an indictment, as supplemented by discovery and elsewise, are so general as to render it impossible to prepare a defense. "Because a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987); *see also Mahabub*, 2014 WL 4243657, at *2. Moreover, the Government's provision of particulars that are tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor her testimony to explain away the Government's case." *United States v. Henry*, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994) (citing *United States v. Cimino*, 31 F.R.D. 277, 279 (S.D.N.Y. 1962)); *Sindone*, 2002 WL 48604,

17

at *1 ("The stakes in a criminal case are high, and temptations of perjury, subornation and intimidation are ever present.   Accordingly, the government is not required to turn over information that will permit a defendant to preview the government's case and tempt him to tailor proof to explain it away, or see to it that the government's proof is not presented.").   These concerns help inform the rule that "if the defendant has been given adequate notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case."   *Henry*, 861 F. Supp. at 1197.

Applying these principles, courts in this District routinely deny motions for bills of particulars that are, at bottom, demands for additional details of the manner in which the offense was committed or how the Government intends to prove its case at trial.   *See, e.g.*, *United States v. Kogan*, 283 F. Supp. 3d 127, 132-34 (S.D.N.Y. 2017) (denying, in healthcare fraud case alleging that Medicare and Medicaid were billed for services never provided, request for bill of particulars to identify the alleged fraudulent claims, how each is false, and documents reflecting services billed for but not provided); *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (denying request for bill of particulars identifying "each act of 'fraud, neglect, connivance, misconduct, and violation of law' upon which the Government will base its case," and noting that Government may not be compelled to disclose manner in which it will prove charges, manner in which defendant committed the crime charged, or a preview of Government's evidence or legal theories); *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977) (rejecting request for bill of particulars regarding the "names, dates and places for the entire case" as "an attempt to discover the minutia of the Government's case" and "plainly unfair").

### 2.  Discussion

Here, a bill of particulars is not necessary given that the defendant has been provided extensive, detailed information about the case against him both in the Indictment (as detailed, *supra*) and through extensive discovery that includes e-mail correspondence, files, and documents from CardReady's own server, as well as documents provided to the Government by the FTC and the FBI's Office in Florida, which conducted earlier investigations of some of the underlying conduct.   This discovery does not require the defendant to seek for the proverbial "needle-in-a-haystack" to identify transactions related to the 26 sham merchants and EMS:   as the defendant knows, much of that work has already been done by the defendant and his employees and agents at CardReady when the scheme was unraveling and the FTC filed its lawsuit.   As was explained in the cover letter provided to the defense at the time (Exh. 1 at item 9), the Government's December 30, 2019 production included, among other things, documents bates stamped USAOCR_REL_0000016378-1411225 which were documents of CardReady, obtained through a subpoena served upon a corporate custodian and former CardReady president, James Berland. These documents came from former CardReady servers and files, including files maintained on a CardReady server in storage and servers and files at Berland's post-CardReady workplace.   (*Id.*)

While the Government makes no representations about the completeness or accuracy of all the files created at the defendant's company's, they contain a wealth of data compilations and analyses directly responsive to the defendant's questions and requests, including information about EMS's chargebacks, commissions paid to the beneficial owners of the sham merchant accounts and individuals who recruited them, payments made to Steven Breier, notes on customer complaints, and more.   By way of example, CardReady's files include spreadsheets named "32% Residuals for NSBI.xlsx" (USAOCR_REL_0001411202), "EMS wires 2014.xlsx"

(USAOCR_REL_0001411205), "Copy of EMS Calls 4 14.xlsx" (USAOCR_REL_0001411206)[14]

"Payments to Agents-Merchants for EMS.xlsx" (USAOCR_REL_0001411207), "EMS CB w

Summary - Vol - Pct summary_SEP-2012-to-OCT-2014.xlsx" (USAOCR_REL_0001411213),

"Steven Breier Accounting.xlsx" (USAOCR_REL_0001411214), "32 Percent Cash Flow.xlsx"

(USAOCR_REL_0001411216), as well as EMS-related sham merchant applications and

supporting documents, and over a thousand additional segregated files in a CardReady folder

named "EMS" with its own subfolders named "Risk" (which includes copies of certain customer

recordings and other documents), "Earnings," "Statements," "Sent by Accounting," and others.

The database-loadable and readily searchable files produced by the Government preserve the

filepath for each of these folders and subfolders to allow the defendant to review them in the same

organizational hierarchy in which they were provided to the Government.   The CardReady server

also included hundreds of internal e-mails, including emails between the defendant and co-

defendant Steven Breier, as well as with numerous other individuals and entities that are the subject

of the Requests regarding the scheme.   These include emails addressing, among other things,

---

[14] As the defendant knows, certain CardReady employees who knew that EMS was behind the sham merchant accounts took steps to investigate EMS's deceptive business, including by interviewing customers who requested chargebacks.   As reflected in the spreadsheet named "Copy of EMS Calls 4 14.xlsx", a CardReady employee reported, "Spoke with [customer], said he received a call out of nowhere regarding lowering on credit card debt.   Customer said he thinks he agreed to the $695.00 charges to have interest lowered.   (Elderly customer- seemed confused). Customer said a few days later he received a letter from the company, and never [heard] a word thereafter."   Another note stated, in part, that a customer was told "they can lower her APR [annual percentage rate], interest, payments on her credit cards . . . agent told her she had no choice but to utilize their services.   Customer stated another agent got on the phone, telling her the same thing.   No choice but to continue using their services.   . . . Customer said she saw the charge come through on her Discover card, called and disputed the charges. Asked customer if she would divulge her age:   yes, 50. At first I thought merchant preying on the elderly. It appears they are preying on all."

telemarketing scripts to be used by EMS, efforts to conceal EMS's prohibited debt-reduction and interest-rate-reduction services as an educational-coaching package, reports of high chargeback rates and terminations of sham merchant accounts, and discussion of the "great exposure" the scheme entailed.

Additionally, the Government's production included documents and correspondence obtained from First Data and Wells Fargo related to processing for the 26 sham merchant accounts, relevant guidelines, correspondence with CardReady, and other topics mentioned in defendant's 203 Requests.   The defense has been in possession of these discovery materials for a substantial period of time:   the CardReady server, First Data, and Wells Fargo documents were first produced over nine months ago, on December 30, 2019.

Thus, while the various other types information Becker seeks might be useful to the defense, it is not necessary, or has already been produced, and a bill of particulars is not warranted. *See, e.g.*, *Strawberry*, 892 F. Supp. at 526 ("That the requested information would be useful to the defendant is not enough; if the defendant has been given adequate notice of the charges against him, the Government need not be required to disclose additional details about its case."); *Cephas*, 937 F.2d at 823 (noting that the Government is not required to "particularize all of its evidence[]"); *Torres*, 901 F.2d at 234 ("Acquisition of evidentiary detail is not the function of the bill of particulars."   (citations and internal quotation marks omitted)); *United States v. Parris*, No. 13 Cr. 17 (DAB), 2014 WL 2745332, at *5 (S.D.N.Y. June 17, 2014) ("The Second Circuit and courts in the Southern District routinely have denied requests for bills of particulars concerning the 'wheres, whens, and with whoms' of the crime charged."); *Mitlof*, 165 F. Supp. 2d at 569 (denying request for bill of particulars identifying "each act of 'fraud, neglect, connivance, misconduct, and violation of law' upon which the Government will base its case[]").

21

Becker's own motion makes clear that he thoroughly understands the charges in the Indictment.  For example, Becker observes that "the government's allegations come down to a claim that Brandon Becker's company, CardReady, was used, either knowingly or unknowingly, by a third-paty [sic] company, EM Systems, to create shell merchant accounts that EM Systems allegedly used to process credit card transactions in furtherance of an alleged debt-repair fraud." (Mem. 24); "As a result, EM Systems was able to process more than $19 million in charges." (*id..*); "the indictment alleges broadly that CardReady falsified merchant applications and created shell merchant accounts to obtain $19 million in credit card processing services from a financial institution" (*id.* at 12).  Indeed, the defendant's command of the allegations is so strong, that he devotes a substantial portion of his discovery motion describing the roles purportedly played by various entities and individuals in the relevant scheme and advancing various factual counter-narratives against the allegations.  (*See, e.g.* Mem. 33 (describing First Data's role), 35 (First Pay's role), 37 (Steven Breier's role), 38 (Maziar Mansori's role), 40-41 (Omid Lari and Kourush Khajavi's role), 41-44 (EM Systems' role), 44 (Steven Short's role), 45-52 (CardReady's role), 55 (Visa/Mastercard structure), 56 (James Berland's role), 58 (Andrew Padnick's role), 60 (Karissa Dyer's role)).  The defendant makes numerous factual assertions in his defense.  *See id.* 52 ("It is defendant's contention that EM System's behavior changed around April 2014, about five months before EM Systems and its affiliated merchant accounts were terminated. This is when CardReady first became aware that EM Systems might be offering interest rate reductions and was recently accruing uptick").  While the resolution of these contentions will be for the factfinder, it is beyond peradventure that the very detailed Indictment and discovery materials have been

"sufficient to apprise the defendant of the charge against him" and allow him to prepare for trial. *Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957, at *4.[15]

### C. Defendant's Requests that the Government Create Indices, Summaries, and Financial Schedules Are Baseless

Defendant asks that the Government be ordered to *create* various indices, evidence summaries, and financial schedules as guides to the ways in which the Government intends to prove its case.   Such requests are extraordinary, and without legal foundation.

For example, while acknowledging that the Government has produced an index to its discovery production (Mem. 14), the defendant asks that the Government create and provide a variety of additional guides to the discovery.   In this regard, the defendant makes the following assertions:

(1)   "the government also has to have some way of indexing the documents it has found so that it can find them again.   The defendant would like to have such an index copied to him. . . ." (Mem. 14);

(2)   "Please provide an index of the documents that have been produced to the defendant so far.   . . . Otherwise, please provide the defense with whatever methodology is being used to keep track of the documents." (Mem. 72, Request 201).

(3)   "the defendant further seeks to have the government provide him with a chart sorted by each [sham] merchant that identifies pertinent emails and the merchant application that First Data relied on to open the account" (Mem at 14 & 72 (Request 202)).

In addition to these requests that the Government create guides to documents and issues, defendant also asks that the Government create financial schedules, including the following:

---

[15]   As to the defendant's request for wiretap-related information (Mem. 72-73), no wiretaps were employed in the Government's investigation of the charged scheme. With respect to the defendant's request for the "final version of the application that was accepted by First Data to open the 26 individual merchant accounts" (Mem. 10), the Government refers the defendant to productions made by First Data and the cover letters associated with those productions identifying the relevant bates numbers for the applications and other information.

(1)    "Please itemize the fees charged by First Data, Wells Fargo and Visa/Mastercard for the credit card accounts First Data serviced." (Mem. 38, Request 3);

(2)    "Please itemize the fees charged by First Pay for the credit card servicing accounts it set up." (Mem. 39, Request 11);

(3)    "Please itemize the commissions and fees charged by Steven Breier for the businesses he recruited on behalf of CardReady." (Mem. 41, Request 21);

(4)    "Please itemize the fees charged by CardReady for the credit card servicing accounts it set up. (Mem. 52, Request 87).

Defendant offers no support for the notion that the Government should be compelled to create such schedules.   It is well settled that Rule 16 "does not require the government to create documents that might provide information a defendant desires to obtain." *United States v. Mahon*, No. 09 Cr. 712 (PHX) (DGC), 2011 WL 5006737, at *3 (D. Ariz. Oct. 20, 2011)); *United States v. McCarroll*, No. 95 CR 48, 1996 WL 99442, at *7 (N.D. Ill. Mar. 5, 1996) ("The government is not generally obligated to create documents which do not exist." (citation omitted)).   More broadly, it is equally well settled that Rule 16 "only applies to documents that already exist, and the [government] is not required to create new documents for discovery purposes." *United States v. Kasnetz,* 2020 WL 5038529 at *2 (N.D Tex. Aug. 26, 2020); *United States v. Chavez*, 15 Cr. 54-5 (RGJ), 2018 WL 6251387, at *1 (W.D. Ky. Nov. 29, 2018) (collecting cases); *see also United States v. Amaya-Manzanares*, 377 F.3d 39, 42 (1st Cir. 2004) ("Rule 16(a)(1)(E) did not apply to the document until it was created."); *United States v. Kahl*, 583 F.2d 1351, 1354 (5th Cir. 1978) (upholding district court's refusal to grant discovery of government statistical compilations when such compilations did not exist).

Accordingly, the defendant's request for new indices and analysis should be denied.

## III.   Witness Information

A running theme in defendant's motion is his desire to learn prematurely about the

witnesses who may be called to testify against him at a trial yet to be scheduled, and to obtain their witness statements.   (*See e.g.* Mem. 24 ("From the record the defense has been able to reconstruct out of the mass of discovery, there is the appearance of the contours of a crime, but very little that would make Brandon Becker a knowing participant. If such evidence is contained in witness statements that have not been turned over, the defendant is entitled to receive them.")).   As a factual matter, the defendant is mistaken:   there is overwhelming documentary evidence of his knowledge, *inter alia,* that CardReady paid agents to recruit people with no business of their own to open sham merchant accounts, intentionally concealed that those accounts were all alter-egos of EMS, made these and other misrepresentations on fraudulent merchant applications, and then used those sham merchant accounts to process EMS's credit card transactions.   In any event, the defendant's request for immediate production of essentially any relevant witness statements in the Government's possession should be denied for the following reasons.

### A.  Jenks Act and *Giglio* Material

The defendant seeks orders directing the Government to produce material pursuant to its obligations under the Jencks Act, 18 U.S.C. § 3500 (Mem. 29-31, 69, Request 204) and impeachment materials relating to possible Government witnesses under *Giglio v. United States*, 405 U.S. 150 (1972) (Mem. 70, Request 208).   The defendant's request for *Giglio* and Section 3500 materials is highly premature at this early posture, when no trial date yet been scheduled. Although the Government is not legally obligated to disclose such materials until its witnesses have testified on direct examination, *see, e.g., United States v. Padilla*, No. S1 94 CR. 313 (CSH), 1994 WL 681812, at *14 (S.D.N.Y. Dec. 5, 1994); *United States v. Percevault*, 490 F.2d 126, 131–32 (2d Cir.1974); the Government will nonetheless begin to disclose any such materials for testifying witnesses in advance of trial and pursuant to the Section 3500 schedule ultimately

adopted by the Court.   The Government is cognizant of its *Giglio* obligations and will produce any such materials on or before the 3500 deadline. Additionally, while not obligated to do so, the Government intends to begin producing, by October 30, 2020, statements of witnesses in its possession (including notes of statements) whom it does not currently anticipate calling at trial.

### B. *Brady* Material

The defendant also requests material favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963).   Specifically, the defendant seeks under *Brady* exculpatory statements from witnesses or individuals whom the Government does not intend to call as witnesses (Mem. 31), as well as "any notes, logs, reports or documentation of investigative techniques that had negative results" (*Id.* 74, Request 220), and other unspecified material. (*Id.* 76, Request 229).[16]   The Government is cognizant of its responsibilities under *Brady* and is currently unaware of any unproduced material falling under its mandate.   It will promptly disclose any such materials of which it becomes aware.   An order specifically directing production of such materials is unnecessary.   *See Padilla*, 1994 WL 681812, at *14 ("In light of [government's] representation [regarding its *Brady* obligations], an order directing the production of such material is unnecessary at the present time.").   Further, as noted, the Government will begin to produce this month all witness statements for witnesses it does not anticipate calling at trial.

---

[16] Request 229, which appears to be incompletely drafted, states that "defendants [sic] seek the following evidence as being potentially helpful or exculpatory" without listing any types of evidence.

## C.  Witness List

Becker requests an order requiring the Government to "immediately provide the defendants with its witness list." (Mem. 21.)   This application should be denied.

As a general matter, "[a] defendant is not entitled to the Government's witness list prior to trial." *United States v. Giffen*, 379 F. Supp. 2d 337, 345 (S.D.N.Y. 2004).   Rule 16 does not require the Government to furnish the names of its witnesses, and the denial of such production will be upheld absent some particularized showing of need. *United States v. Bejasa,* 904 F.2d 137 139-40 (2d Cir. 1990). *United States v. James,* 2007 WL 914242 (E.D.N.Y. Mar. 21, 2007) ("generally the Second Circuit has held that such [a witness list] will be ordered disclosed to the defense only where there has been a particularized showing of need"); *United States v. Giffen*, 379 F. Supp. 2d, at 345 (court "has discretion to compel pretrial disclosure of the Government's witnesses, where a defendant makes a 'specific showing that disclosure [is] both material to the preparation of his defense and reasonable in light of the circumstances surrounding his case.'") (quoting *United States v. Cannone*, 528 F.2d 296, 301 (2d Cir. 1975)); *United States v. Washington*, 947 F. Supp. 87, 88 (S.D.N.Y. 1996); *see also Weatherford v. Busey*, 429 U.S. 545, 559 (1977); *United States v. Alessi*, 638 F.2d 466, 481 (2d Cir. 1980).

While the Government would not oppose disclosing a list of potential trial witnesses shortly before trial, the defendant has not made any specific showing of particularized need and materiality, particularly under the circumstances here, where no trial date has yet been scheduled and where the defendant himself was eminently capable of identifying a large number of prospective witnesses in his own motion. Premature disclosure of potential cooperating witnesses would be particularly inappropriate here in light of specific witness intimidation concerns raised during the course of the defendant's multiple bail proceedings.   Accordingly, this request should

be denied.  *See, e.g.*, *United States v. Bielli*, 697 F. Supp. 2d 403, 409 (E.D.N.Y. 2010) (denying Fed. R. Crim. P. 16 discovery request for pretrial disclosure of witnesses and confidential informants because defendant did not make a specific showing of need).

### D. Identity and Whereabouts of Witnesses and Informants and Disclosure of Co-Conspirator Statements

Relatedly, the defendant requests the Court to order the Government to disclose the identity of any witness or informant who will be a material witness in the case against the defendant, provide their whereabouts, and "make them available to the defense."  (Mem. 23-25.).  This apparent boilerplate request has no bearing to this case.  The sole case from the Second Circuit cited by the defendant (Mem. 24), *United States v. Roberts*, 388 F.2d 646    (2d Cir. 1968),       is entirely inapposite.  There, in a drug prosecution, a government agent testified that a specific informant "was present during all the significant events" charged, leading the Second Circuit to point out that he "was obviously a crucial witness to the alleged narcotics transactions." 388 F.2d at 649.  Here, the Indictment does not reference any "informants," and the defendant fails to specify which, if any, "informants" it is seeking to unmask, or why.

Likewise, defendant's request for immediate production of co-conspirator statements (Request 227) should be denied.   "It is well-settled that the Court cannot order advance disclosure of co-conspirator statements."  *United States v. Annabi*, No. S1 10 Cr. 7 (CM), 2011 WL 6015635, at *4 (S.D.N.Y. Nov. 30, 2011); *see also, e.g., In re United States of America,* 834 F.2d 283, 286-87 (2d Cir. 1983) (granting mandamus to vacate order requiring production of witness statements); *United States v. Percevault,* 490 F.2d 126 (2d Cir. 1974) (holding that ordering Government to disclose witness statements under Rule 16(a) was "untenable").  Aside from any materials within the scope of the Government's *Brady* obligations, statements of co-conspirators

28

the Government intends to call at trial will accompany the 3500 material, as is the practice in this District.   The Government will provide such material to the defense sufficiently in advance of the beginning of trial so as to allow the defendant to prepare.

It bears noting that the defendant was the head of a small company that submitted 26 fraudulent merchant applications in furtherance of the EMS scheme.   Given the relatively limited universe of individuals who might constitute unindicted co-conspirators, particularized identification of these individuals is not necessary.   This is particularly so where, as here, most or all of these individuals are apparently known to Becker, particularly based upon the detailed averments in his motion.   Here, because "[a]ll of the charged transactions involve financial dealings in which a limited number of persons had an interest and as to which most, if not all, relevant information would have been confined to the Defendants and/or persons who reported to one or more of them directly or indirectly." *United States v. Joseph,* 02 CR 1589 (LTS), 2003 WL 22019427 at *2 (S.D.N.Y. Aug. 26, 2003) (quoting *United States v. Reddy,*190 F.Supp.2d 558, 570 (S.D.N.Y. 2002)), there is "no need for a bill of particulars identifying the un-indicted co-conspirators referred to in the Indictment in order to enable [the defendants] adequately to prepare [their] defense."   *Id.*   Indeed, even in more sprawling fraud cases, courts routinely deny blanket requests for the identities of all co-conspirators.   *See, e.g.*, *United States v. Percoco*, No. 16-cr-776 (VEC), 2017 WL 6314146 at **1, 21 (S.D.N.Y. Dec. 11, 2017) (denying request for bill of particulars identifying unindicted co-conspirators in eight-defendant "Buffalo Billion" case that "encompass[ed] a range of federal crimes including Hobbs Act extortion, honest services wire fraud, federal funds bribery, and false statements," because the Indictment and Complaint contained "more than sufficient detail to enable [the defendants] to adequately prepare for trial"); *Rittweger*, 259 F. Supp. 2d at 292 (concluding, in thirteen-count, multi-defendant securities fraud

29

case that the indictment and discovery were sufficient and "[t]here is no need to provide a list of all unindicted co-conspirators"); *United States v. Trippe*, 171 F. Supp. 2d at 240 (denying a bill of particulars seeking names of all co-conspirators and aiders and/or abettors in securities and mail fraud case in light of sufficiency of information contained in the indictment and through discovery) (collecting cases); *United States v. Goode,* 16 Cr. 529 (NSR), 2018 WL 919928 (S.D.N.Y. Feb. 15, 2018) (rejecting motion for bill of particulars including identities of co-conspirators); *United States v. Minaya,* 395 F. Supp. 2d 28 (S.D.N.Y. 2005) (same).

## IV. Defendant's Request for Immediate Rule 404(b) Notice Should Be Denied As Premature

Defendant requests "immediate notice of any evidence that the Government may seek to introduce evidence as alleged acts or wrongs other than those alleged in the Indictment to prove a defendants' motives, opportunity, preparation, plan, knowledge, identities, or absence of mistake or accident under Rule 404(b) of the Federal Rules of Evidence." (Request 230).   Under Rule 404(b), the Government must "provide reasonable notice of the general nature of any such evidence that the prosecutor intends to offer at trial; and . . . do so in writing before trial--or in any form during trial if the court, for good cause, excuses lack of pretrial notice." Fed. R. Evid. 404(b)(2)(A)-(B).

The Government acknowledges its notice requirement, as it is still determining what 404(b) evidence it will seek to introduce at trial.   The Government will provide the defendant with notice of any 404(b) evidence which it anticipates introducing at trial at least 30 days in advance of trial, or pursuant to whatever schedule set forth by the Court.   Accordingly, the defendant's motion for immediate notice should be denied.   *See, e.g., United States v. Buckner,* 417 F.Supp.2d 240, 243 (S.D.N.Y. 2005) (denying motion to preclude Rule 404(b) evidence as premature where trial date

30

had not been set and where Government indicated that it would provide Rule 404(b) notice 30 days prior to trial); *United States v. Saade,* No. S1 11 Cr. 111, 2012 WL 2878087, at *8 (S.D.N.Y. July 11, 2012) (denying as premature defendant's motion to compel the Government to disclose 404(b) evidence where trial date had not been set and where the Government was "still determining what 404(b) evidence, if any, it will seek to introduce at trial"); *United States v. Allums*, No. 97 CR. 267 (HB), 1997 WL 599562, at *1 (S.D.N.Y. Sept. 25, 1997) ("The Government has agreed to produce this material in time so that the defense may have an opportunity to challenge their admission; this is all that is required with respect to Rule 404(b) evidence."); *United States v. Davis*, No. 05 CR. 0694 (VM), 2006 WL 20493, at *1 (S.D.N.Y. Jan. 3, 2006) ("The Government has asserted that it intends to make a motion in limine for the admission of Rule 404(b) evidence approximately two weeks before trial. In the absence of any showing that the evidence is required earlier, the Court denies Davis' request for immediate disclosure.").

Accordingly, defendant's motion for notice and/or production of Rule 404(b) evidence should be denied at this time.

## V.   United States Sentencing Guideline Analysis

Lastly, defendant seeks information relevant to the Government's calculation of his applicable sentencing range under the U.S. Sentencing Guidelines.   (Mem. 76, Request 230).   To the extent that the defendant wishes to discuss a possible guilty plea in this case, the Government has no objection—upon a request from the defense—to setting forth our Guidelines calculations in a letter, pursuant to the suggestion of the Second Circuit in *United States v. Pimentel,* 932 F.2d 1029, 1034 (2d Cir. 1991).

31

**CONCLUSION**

For the foregoing reasons, the Court should deny defendant's omnibus discovery motion.

Dated:   New York, New York
        October 2, 2020

                                       Respectfully submitted,

                                       GEOFFREY S. BERMAN
                                       United States Attorney

By:     /S/
                                         DAVID RAYMOND LEWIS
                                       VLADISLAV VAINBERG
                                       Assistant United States Attorneys
                                       (646) 787-5645 / (212) 637-1029